**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PATRICIA HUNT SINACOLE,** ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 2:04cv0921 |
| ) | **Electronic Filing** |
| **IGATE CAPITAL, a/k/a IGATE** ) | |
| **CAPITAL CORP., a/k/a IGATE** ) | |
| **CORPORATION,** ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

December 19, 2006

**I.      INTRODUCTION**

Defendant, iGate Capital, a/k/a iGate Capital Corp., a/k/a iGate Corporation ("iGate"),

has filed a motion for summary judgment.  After careful consideration of the motion, the

memoranda of law in support and in opposition and the supporting materials supplied by the

parties, this Court will grant the motion.

**II.      STATEMENT OF THE CASE**

Plaintiff, Patricia Hunt Sinacole, was discharged from her employment on June 30, 2001.

She contends that her termination constituted discrimination on the basis of her sex and

pregnancy and that it violated her rights under Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e to 2000e-17 (Title VII), the Pregnancy Discrimination Act, 42 U.S.C.

§ 2000e(k) (PDA), the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601-54 (FMLA)

and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA).  She also alleges that it

constituted a breach of her employment contract under Pennsylvania law, for which she seeks

salary, wages and benefits under the Pennsylvania Wage Payment and Collection Law, 43 P.S.

§§ 260.1 to 260.12 (WPCL).

Facts

Plaintiff and Mastech Systems Corporation ("MSC") were parties to a written

employment agreement dated April 14, 1998 and effective May 4, 1998.  (Pretrial Stip. at 4 § III,

¶ 2; Def.'s Concise Statement Material Facts ¶ 1; Pl.'s Counterstatement ¶ 1.)[1]  Pursuant to the agreement, she was employed full-time as Corporate Human Resources Director for MSC and received an annual salary of $80,000.00 and "standard Company benefits."  (Agmt. at 2-3, 10; Sinacole Dep. at 20-22, 26-28.)[2]

In July 1999, Plaintiff took FMLA leave in connection with the birth of her first child after submitting a written leave request that was approved in writing by her supervisor.  (Pretrial Stip. at 4 § III, ¶ 3.)  This FMLA leave extended from July 12, 1999 to October 1, 1999.  (Docket No. 53 Ex. C.)  While she was on leave, Plaintiff provided notification that she was moving from Pittsburgh to Philadelphia and would be resigning from her full-time salaried position with MSC.  (Pretrial Stip. at 4, § III, ¶ 4.)  MSC requested that she become a "W-2 hourly" employee, compensated at an hourly wage of $75 without the full range of standard Company benefits provided to salaried employees, and working with no guarantee of a particular number of hours of work to be assigned to her, but rather as her employer determined it needed her services.  She agreed, and her title was changed to Director of Human Resources Consulting Services.  (Sinacole Dep. at 29-30, 36-40, 172-73.)[3]

MSC underwent a number of name changes and/or corporate transitions over the next several years.  The parties agree about some of these and disagree as to others and the record is not clear.  They agree and the record is uncontroverted that the ultimate parent corporation was renamed iGate Capital Corporation in 2000, and then iGate Corporation in 2002.  (Zugay Dep. at

---

[1]Docket Nos. 22, 27, 38.

[2]Def.'s App. (Docket No. 29) at 2-3, 10, 171-76.  Plaintiff denies that her position was "full-time," noting that the term does not appear in the Agreement.  However, she said yes when asked at her deposition if it was a full-time position.  (Sinacole Dep. at 20.)

[3]Docket No. 29 at 177-78, 180-84, 259-60.

8, 13; Daugherty Aff. ¶ 4;[4] Daugherty Dep. at 14.[5])

Beginning in the spring of 2000, there was a reorganization of iGate Corporation and its affiliated companies. As a result, on April 10, 2000, Plaintiff was placed on the payroll of iGate Capital Management, Inc. ("ICMI"), a newly-formed Pennsylvania corporation and a subsidiary of MSC, and was paid by ICMI and not by MSC (or iGate Capital Corporation) for services provided after April 7, 2000. (Walsh Decl. ¶¶ 5-9, 12-13 & Exs. A, B, C, F, I;[6] Docket No. 29 at 14-20; Daugherty Dep. at 17.[7])

Defendant indicates that, in late 2000, Plaintiff was told that ICMI would not pay her to do work for other subsidiaries of MSC (Defendant refers to the subsidiaries of MSC and iGate as the "Portfolio Companies"), but that she could market her services directly to other Portfolio Companies so long they agreed to place her on their payrolls and to pay her for services. Plaintiff responds that she was told she could continue working for iGate and its subsidiaries and that she intended to continue abiding by the terms of her employment agreement. (Docket No. 29 at 155; Sinacole Dep. at 44-47, 152-54, 252-53.[8])

As a result, by the end of 2000 Plaintiff was on the payrolls of, and was being paid separately by, the following three Portfolio Companies: ICMI, Mascot Systems Limited ("Mascot") and Global Financial Services of Nevada ("GFS"). (Walsh Decl. ¶¶ 6-9 & Exs. B, C, D, E, I, J, K; Docket No. 29 at 14-20; Sinacole Dep. at 47, 50, 252-53.[9])

Beginning in late 2000 and continuing through at least December 2002, there were ongoing reductions in the collective workforces of the Portfolio Companies, including the

---

[4]Docket No. 31.

[5]Docket No. 29 at 286.

[6]Docket No. 32.

[7]Docket No. 29 at 289.

[8]Docket No. 29 at 186-89, 254-56, 271-72.

[9]Docket No. 29 at 189, 192, 271-72.

workforce of ICMI.  (Docket No. 29 at 160, 165; Zugay Dep. at 33-34, 42-43, 56;[10] Zugay Aff. ¶ 12.[11])

On November 28, 2000, Plaintiff submitted a request for FMLA leave, again because of pregnancy.  She indicated that she was requesting to be off from her expected due date, April 4, 2001, until July 4, 2001.  (Pl.'s App. Ex. J.)[12]  She never received a response to her request for leave.  She began her leave on April 6, 2001, the date she gave birth. (Sinacole Dep. at 92-93.)[13] On May 23, 2001, Plaintiff submitted a notice of intent to return from leave, indicating that she would be able to return on July 2, 2001.  (Pl.'s App. Ex. L.)[14]

On June 22, 2001, Frank Corris, Director of Corporate Resources for ICMI (Daugherty Aff. ¶ 10), sent Plaintiff an email and a letter in which he stated as follows:

> We regret to inform you that your employment with iGate Capital and its subsidiary companies is being terminated as of June 30, 2001.  Because of your current part-time and "as needed" employment, we do not find that we owe you any outstanding payroll payments at this time.  Should you believe our records are in error, please present me with any outstanding hours due you.  Upon confirming any remaining hours worked and due to you, we will pay you in an expeditious manner.
>
> Finally, you are required to return all iGate Capital (formerly Mastech) equipment, computers, laptop ... software, etc. ... by June 30, 2001...

(Docket No. 29 at 55.)  Thus, she was notified on June 22, 2001 that she was being terminated effective June 30, 2001.  (Pretrial Stip. at 4 § III, ¶ 5.)

Michael Zugay, Secretary of iGate Corp. and Senior Vice President and Chief Financial

---

[10]Docket No. 29 at 302-03, 307-08, 310.

[11]Docket No. 30.

[12]Docket No. 44.

[13]Docket No. 29 at 222-23.

[14]Docket No. 44.

Officer of ICMI (Daugherty Dep. at 20;[15] Zugay Dep. at 6;[16] Zugay Aff. ¶ 1), confirmed that Plaintiff's termination email from Frank Corris was "a termination from all the iGate companies." (Zugay Dep. at 51.) Zugay and iGate CEO Sunil Wadhwani had discussed the Plaintiff's termination prior to Corris sending the termination email. (Id. at 59-60.) Zugay stated that he actually reviewed and revised the termination letter before it was sent to the Plaintiff. (Id. at 48.)

When Zugay was informed that the Plaintiff was still performing work for GFS, one of the Portfolio Companies, after the date of the termination e-mail, he called Dan O'Donnell, CEO of GFS (Daugherty Aff. ¶ 9), and told him "he needed to not use Patti and to use some of the people in the HR group under Mr. Frank Corris." (Zugay Dep. at 57.) Zugay informed Dan O'Donnell "that Dan was ordered by Sunil [Wadhwani] and iGate to stop using her." (Id. at 73.) Zugay also informed Mascot that it was to cease using the Plaintiff's services. (Id. at 56-57.)

On July 10, 2001, Frank Corris wrote the following to Plaintiff regarding her continued work for GFS:

> I have discussed your termination with Jonathan Bonime since our last discussion. We want a clear departure from your old Mastech employment agreement; therefore, the termination will stand as originally outlined in the termination notice. Your last day as an employee was June 30, 2001. The matter of you consulting for GFS is a matter for Dan O'Donnell to address. If he feels that he is in need of your service, he may contract with you directly but not as an employee. As you stated in your email, you are not working enough hours to qualify for benefits and are more suited to a consulting relationship. Your access to iGate Capital IT services and PeopleSoft databases has been discontinued.

(Pl.'s App. Ex. M).[17]

After June of 2001, Plaintiff continued to submit time for her services for payment on a W-2 hourly basis by GFS until December 14, 2001, and, after that, as an independent contractor through her company, First Beacon Group, until February 23, 2002. (Docket No. 29 at 94-117,

---

[15]Pl.'s App. Ex. G (Docket No. 43).

[16]Pl.'s App. Ex. B (Docket No. 39).

[17]Docket No. 44.

125-41; Sinacole Dep. at 57, 75-81, 84-85[18]; Walsh Decl. ¶ 17 & Ex. M.)

Procedural History

Plaintiff filed a charge of discrimination with the Pennsylvania Human Relations Commission (PHRC) on or about December 13, 2001, with a request that it be dual-filed with the Equal Employment Opportunity Commission (EEOC). (Docket No. 29 at 148.) A right to sue letter was issued by the EEOC on or about June 21, 2004. (Docket No. 29 at 338.)

Plaintiff filed this action on June 17, 2004 and on July 6, 2004, she filed an amended complaint. Count I alleges that her termination violated the FMLA in that she was terminated prior to the expiration of her FMLA leave and after notice of her intention to return to work and her physician's certification of her ability to do so. Count II alleges that Defendant violated her rights under the PHRA. Count III alleges that Defendant violated her rights under Title VII and the PDA. Count IV alleges that Defendant breached her contract of employment. Finally, Count V seeks salary, wages and benefits allegedly due her under the WPCL.

On March 27, 2006, a motion for summary judgment was filed by Defendant.

## III.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001) (quoting Foehl v. United States, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Doe v. County of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001); Woodside, 248 F.3d at 130; Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).

When the non-moving party will bear the burden of proof at trial, the moving party's

---

[18]Docket No. 29 at 199, 209-15, 217-18.

burden can be "discharged by 'showing'–that is, pointing out to the District Court–that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).


IV.    **DISCUSSION**

        Was iGate Plaintiff's Employer?

        The parties spend a considerable amount of time debating the issue of whether iGate was Plaintiff's "employer." Defendant contends that Plaintiff worked primarily for ICMI, that iGate is the parent corporation, that it is a holding company with no employees[19] and as such, it can be held liable only if its activities are "so interrelated and integrated" with those of ICMI as to justify piercing the corporate veil and that Plaintiff has not met this difficult task here. It further argues that Plaintiff cannot demonstrate that iGate was her employer even under the slightly less onerous substantive consolidation test.

        The Court will not resolve this issue, for the following reasons. First, the Supreme Court has held that determining whether an entity has a sufficient number of employees to meet the minimum under a discrimination statute is an issue that goes to the merits of the cause of action, not a question of subject matter jurisdiction. Arbaugh v. Y&H Corp., 126 S.Ct. 1235 (2006) (Title VII). See also Minard v. ITC Deltacom Commc'ns, Inc., 447 F.3d 352, 356 (5th Cir. 2006) (applying Arbaugh to the FMLA). Thus, there is no reason why this aspect of the merits needs to be decided prior to other elements of the cause of action.

        Second, Plaintiff has pointed to a number of facts that undermine Defendant's contention

_____

[19]The various anti-discrimination statutes under which Plaintiff sues all contain a requirement that the "employer" must employ a threshold number of employees, as follows: FMLA (50), Title VII (15), PHRA (4). See 29 U.S.C. §§ 2611(2)(B)(ii), 2611(4)(A)(i); 42 U.S.C. § 2000e(b); 43 P.S. § 954(b).

that iGate was not her employer.  Specifically: 1) Sunil Wadhwani, the CEO of iGate, testified

that MSC became Mastech Corp. (Wadhwani Dep. at 7),[20] and because Mastech Corp. became

iGate Capital Corp. which became iGate Corp., there is evidence in the record from which a

factfinder could conclude that Plaintiff was employed by an entity that eventually was renamed

iGate Corp.; 2) Plaintiff was terminated, at the direction of the CEO of iGate, from "iGate and all

its subsidiaries," thus distinguishing this case from the facts of Nesbit,[21] in which the CEO

merely terminated the plaintiff from one of the two companies for which she worked; 3) Mr.

Wadhwani referred to "iGate" and the "Parent Company" interchangeably throughout his

deposition and could not identify who issued his paycheck (Wadhwani Dep. at 17-20, 22-23, 29,

31-32, 53); 4) Mr. Wadhwani further testified that in 2001, iGate had "85 or 90" employees at its

parent headquarters (id. at 29); 5) Plaintiff's employment contract with MSC contained a broad

definition of the term "Company" which stated that it applied to any affiliate, direct or indirect

parent or subsidiary, and also stated that it would inure to the benefit of any successors, assigns,

heirs and legal representatives and that the Company had the right to assign it in connection with

a merger involving the Company or a sale or transfer of substantially all of the business and

assets of the Company (Agmt. ¶¶ 1(a), 18)[22]; 6) Defendant's own attorney, in correspondence

with Plaintiff's attorney on "iGate Capital" letterhead, stated that he was forwarding "summaries

of your client's earnings during 2001 at iGate Capital, the holding company, Mascot ... and

[GFS]" and that "there is no separate HR function at the holding company level, where

headcount was cut in half" (Daugherty Dep. Ex. 1)[23]; and 7) iGate's 2001 Form 10-k, filed with

the Securities and Exchange Commission, states that, in August 2001, it "reduced employee

headcount by 84.  These employees ranged from executive level through administrative

---

[20]Pl.'s App. Ex. A (Docket No. 39).

[21]Nesbit v. Gears Unlimited, Inc., 347 F.3d 72 (3d Cir. 2003), cert. denied, 541 U.S. 959
(2004).

[22]Docket No. 29 at 1, 8.

[23]Pl.'s App. Ex. G (Docket No. 43).

8

assistants, and affected eJiva, Emerging eServices, and iGate Corporation."  (Pl.'s App. Ex. N at 43.)[24]

Therefore, the Court will assume, without deciding, that iGate was Plaintiff's "employer" for purposes of the claims asserted in this case.

Count I: FMLA Claim

The FMLA was enacted in 1993 for two purposes: to "balance the demands of the workplace with the needs of families" and to "entitle employees to take reasonable leave for medical reasons."  29 U.S.C. § 2601(b)(1-2).  The Act grants to an "eligible employee," among other things, the right to twelve workweeks of leave, over any period of twelve months, because of "the birth of a son or daughter of the employee and in order to care for such son or daughter" 29 U.S.C. § 2612(a)(1)(A).

The Act contains two relatively distinct types of provisions: a series of prescriptive substantive rights for eligible employees, often referred to as the "entitlement" or "interference" provisions which set floors for employer conduct, 29 U.S.C. §§ 2612, 2614(a)(1); and protection against discrimination based on the exercise of these rights, often referred to as the "discrimination" or "retaliation" provisions, 29 U.S.C. § 2615(a)(1-2); 29 C.F.R. § 825.220(c). Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir.), cert. denied, 126 S.Ct. 389 (2005).  An employee may bring suit to enforce these rights pursuant to section 2617(a) of the Act. Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004).  Plaintiff contends that she asserts claims only under the interference provisions, although Defendant argues that her claims arise under the retaliation provision.  Because Plaintiff cannot demonstrate that she was eligible for FMLA leave, the Court need not resolve this issue.

The Court of Appeals for the Third Circuit has held that, "[i]n order to assert a claim of deprivation of entitlements, the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them."  Callison, 430 F.3d at 119.  The court has further explained that:

_____

[24]Docket No. 44.

> Under this theory, the employee need not show that he was treated differently than others.  Further, the employer cannot justify its actions by establishing a legitimate business purpose for its decision.  An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.

Id. at 119-20.

Defendant argues that Plaintiff was not eligible for FMLA leave.  The Act defines an "eligible employee" as one who has been employed for at least one year and has worked at least 1,250 hours in the twelve-month period immediately preceding the leave.  29 U.S.C. § 2611(2)(A).

In the year prior to April 6, 2001, Plaintiff submitted hours for payment to and was paid by MSC and the Portfolio Companies in the following amounts: ICMI– 949.25 hours; Mascot–54 hours; GFS– 284 hours; MSC–13 hours.  (Walsh Decl. ¶¶ 5-8 & Exs. A, B, C, D; Docket No. 29 at 14-20; Sinacole Dep. at 273-74.[25])  During this time period, she did not submit hours for payment to and was not paid by any other entity affiliated with iGate Corporation, including iGate Corporation itself.  (Walsh Decl. ¶ 9.)

Defendant contends that she worked for a total of 962.25 hours for MSC and ICMI, well short of the amount of hours required.  Defendant notes that she cannot count the 284 hours she worked for GFS because she admits that she did not request leave from GFS and she worked for it immediately after her leave, and she has chosen not to count the 54 hours she worked for Mascot.

Plaintiff does not dispute Defendant's calculation of her hours worked.  Rather, she responds that Defendant should be estopped from arguing that she was not entitled to leave because it did not inform her of this fact at the time.  To support this argument, she cites a Department of Labor regulation, which provides that:

> The determinations of whether an employee has worked for the employer for at least 1,250 hours in the past 12 months and has been employed by the employer for a total of at least 12 months must be made as of the date leave commences.  If an employee notifies the employer of need for FMLA leave before the employee meets these eligibility criteria, the employer must either confirm the

---

[25]Docket No. 29 at 274-75.

> employee's eligibility based upon a projection that the employee will be eligible on the date leave would commence or must advise the employee when the eligibility requirement is met.... If the employer fails to advise the employee whether the employee is eligible prior to the date the requested leave is to commence, the employee will be deemed eligible. The employer may not, then, deny the leave....

29 C.F.R. § 825.110(d). A few courts have concluded that, although this regulation is invalid insofar as it expands the definition of "eligible employee" under the FMLA,[26] it might be invoked by an employee who relied to her detriment on an employer's representation that she was eligible for FMLA leave. See Woodford v. Community Action of Greene County, Inc., 268 F.3d 51 (2d Cir. 2001); Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 795-97 & n.4 (11th Cir. 2000); Dormeyer v. Comerica Bank-Illinois, 223 F.3d 579, 582 (7th Cir. 2000). Other courts have cited the judicial doctrine of equitable estoppel (not the regulation) and concluded that, when an employee relies to her detriment on an employer's representations about FMLA leave, the employer cannot later contend that the employee was ineligible. See Minard, 447 F.3d at 359 (employer told employee she could take FMLA leave); Sorrell v. Rinker Materials Corp., 395 F.3d 332, 336 (6th Cir. 2005) (same); Duty v. Norton-Alcoa Proppants, 293 F.3d 481, 493-94 (8th Cir. 2002) (employer told employee that a 34-week leave was permitted)

In Kosakow v. New Rochelle Radiology Associates, 274 F.3d 706, 724-25 (2d Cir. 2001), the court held that: 1) the regulation would be invalid to the extent that it expands the definition of "eligible employee"; 2) the district court erred in citing a case that involved an employee who had the requisite number of hours and then relied on an employer's representation that 16 weeks of leave would be acceptable because Kosakow did not have the minimum amount of hours; but 3) the judicial doctrine of equitable estoppel could apply under these circumstances: a) the employer's failure to post notices or include in its employee manual information about FMLA leave requirements led to her decision to work an insufficient amount of hours prior to taking

---

[26]The Supreme Court held, in Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002), that another regulation issued by the Secretary of Labor was contrary to the FMLA because it provided for a cause of action and damages when an employer committed a technical violation of the Act (failure to notify the employee that the leave would count as FMLA leave) but nevertheless provided the employee with all the leave that the Act required.

leave for elective surgery, so she demonstrated detrimental reliance; b) because the FMLA requires employers to notify employees of conditions needed for leave, silence constitutes a misrepresentation; and c) although the doctrine of equitable estoppel requires "deliberate misconduct" it does not require an intent to deceive.  Other courts have applied the doctrine only in situations in which the employer made an affirmative representation to the employee that it later attempted to withdraw.  Minard, 447 F.3d at 359; Sorrell, 395 F.3d at 336.

The Court of Appeals for the Third Circuit has not addressed this issue.  Defendant argues that, even assuming the Court of Appeals would apply the doctrine of equitable estoppel in an FMLA case, Plaintiff could not demonstrate that she met the elements of an equitable estoppel claim in any event: 1) because she was employed on an as-needed basis, it could not be determined when she might meet the eligibility requirement; 2) she did not rely to her detriment on any representations made by ICMI because the birth of her child was not an adjustable event; 3) she was well aware of these facts as a high-level human resources employee; and 4) ICMI did not intend for her to rely on its silence with respect to her request for leave–the person to whom she submitted it made clear that she did not know what to do.

The Court predicts that the Court of Appeals for the Third Circuit would find the regulation invalid insofar as it expands the definition of "eligible employee" under the FMLA to someone who did not work 1,250 hours in the preceding year, for the reasons expressed by the other courts of appeals that have addressed the issue.  The Court further predicts that the Court of Appeals would apply the judicial doctrine of equitable estoppel in appropriate circumstances, but that such circumstances are not presented here.  Plaintiff's employer did not misrepresent to her that she could take FMLA leave and then renege on its word.  Rather, her request was met with silence (and apparent confusion).  In addition, given Plaintiff's as-needed work status, it could not be calculated when she might acquire enough hours to qualify for FMLA leave.  Plaintiff has not suggested, much less demonstrated, that she would have worked 1,250 hours prior to the time she needed to take leave because of the birth of her child, an event that (unlike the elective surgery in Kosakow) was not adjustable.

Defendant has presented evidence that Plaintiff was actually involved in developing an

employee handbook outlining FMLA practices and procedures which expressly stated that employees had to work at least 1,250 hours in the twelve months preceding leave, that she was also involved in putting together the FMLA packet that was sent to anyone requesting FMLA leave and that she answered questions regarding the administration of FMLA policy. (Shetty Aff. ¶ 3;[27] Mastech Employee Handbook at 888;[28] Sinacole Dep. at 195-98.[29]) Thus, this case is distinguishable from <u>Kosakow</u> because the employer provided the information about FMLA leave requirements in its employee manual (which Plaintiff was involved in developing) and she has not contended that it failed to post FMLA notices as required by the Act.

Defendant has also submitted e-mail correspondence between Plaintiff and Jamie Miller, the Benefits Administrator, which suggests that Miller, the individual to whom the request was submitted, did not know what to do and was asking Plaintiff for her help.  (Docket No. 53 Ex. D.)  Thus, although Plaintiff argues that the FMLA applies to her as to any other employee, regardless of her knowledge of its scope, she has not explained why she should be allowed to rely on an equitable doctrine when the facts of her case (including her knowledge) do not require it. <u>See</u> <u>Kosakow</u>, 274 F.3d at 725 ("Whether equitable estoppel applies in a given case is ultimately a question of fact.")  Therefore, with respect to Count I of the complaint, the motion for summary judgment will be granted.

<u>Counts II-III: Title VII/PDA/PHRA Claims</u>

Title VII provides that it is an unlawful employment practice for an employer to discriminate against an individual with respect to conditions of employment because of her sex. 42 U.S.C. § 2000e-2(a).  The PDA clarifies that the terms "because of sex" and "on the basis of sex" "include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions...." 42 U.S.C. § 2000e(k).  The PHRA provides, inter alia, that it is an unlawful employment practice:

---

[27]Docket No. 33.

[28]Docket No. 53 Ex. B.

[29]Docket No. 53 Ex. A.

> For any employer because of the ... sex ... of any individual ... to otherwise
> discriminate against such individual ... with respect to ... compensation, hire,
> tenure, terms, conditions or privileges of employment or contract, if the individual
> ... is the best able and most competent to perform the services required.

43 P.S. § 955(a).  Claims brought under the PHRA are analyzed under the same standards as

claims under Title VII.  See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d

Cir. 2000).

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie

case of discrimination indirectly following the shifting burden analysis set forth by the Supreme

Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas

Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a
> question of law that must be decided by the Court.  It requires a showing that: (1)
> the plaintiff belongs to a protected class; (2) he/she was qualified for the position;
> (3) he/she was subject to an adverse employment action despite being qualified;
> and (4) under circumstances that raise an inference of discriminatory action...

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

In a reduction in force (RIF) situation, the fourth element consists of showing that persons

outside the protected class (i.e., that were not pregnant) were retained.  In re Carnegie Ctr.

Assocs., 129 F.3d 290, 294-95 (3d Cir. 1997).

If the employee presents a prima facie case of discrimination, the employer must

"articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

McDonnell Douglas, 411 U.S. at 802.  If the employer specifies a reason for its action, the

employee must have an opportunity to prove the employer's reason for the adverse employment

action was a pretext for unlawful discrimination.  Id. at 804.  The Court of Appeals has stated

that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's
> proffered  legitimate  reasons must allow a factfinder to reasonably infer that each
> of the employer's proffered non-discriminatory reasons was either a post hoc
> fabrication or otherwise did not actually motivate the employment action  (that is,
> the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

14

Time Bar to Title VII Claim

Defendant's first argument is that Plaintiff's Title VII claim should be dismissed because she did not file her charge of discrimination with the EEOC until July 15, 2002 (Docket No. 29 at 168) and therefore this claim is untimely.  It notes that there was no docket activity in Plaintiff's PHRC/EEOC proceedings during the period from January 8, 2002 through July 9, 2002.  (Docket No. 29 at 150).

A charge of discrimination must be filed with the EEOC within 300 days of the adverse employment action.  42 U.S.C. § 2000e-5(e)(1); Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000).  Defendant argues that, because the adverse employment action occurred on or around June 22, 2001, her charge of discrimination had to be filed with the EEOC by April 18, 2002.[30]

Plaintiff responds that she timely filed a charge with the PHRC and requested that it be dual-filed with the EEOC but, due to oversights at the PHRC, the charge was not forwarded in a timely manner.  Plaintiff's counsel has submitted an affidavit, in which he states as follows: after he filed a charge of discrimination with the PHRC on December 13, 2001, the charge was placed in a PHRC investigator's drawer along with several other charges and apparently forgotten. After the investigator's departure, the charge was discovered and forwarded to the EEOC.  In the Spring of 2002, Supervisor Joseph Retort of the PHRC advised Plaintiff's counsel of this sequence of events, apologized on behalf of the agency and said that neither Plaintiff nor her counsel was responsible for any delay caused by this former employee.  (Murtagh Aff. ¶¶ 2-7.)[31]

Under these circumstances, the delay in filing the charge with the EEOC cannot be attributed to Plaintiff or her counsel.  See, e.g., Berksoki v. Ashland Regional Med. Ctr., 951

---

[30]Defendant has not explained why the date of the correspondence, rather than the date established therein as her last date of employment, should constitute the date of the adverse employment action.  Had Plaintiff's services been requested by a Portfolio Company between June 22 and June 30, 2001, nothing in Mr. Corris's letter or email suggests that she could not have provided them.

[31]Pl.'s App. Ex. F (Docket No. 43).

15

F. Supp. 544, 548-49 (M.D. Pa. 1997) (PHRC's failure to refer case to EEOC as plaintiff instructed did not bar suit).  Moreover, the regulations provide that a charge filed with the PHRC shall "be deemed filed" with the EEOC 60 days after the plaintiff files it along with a request that it be dual-filed, whether or not the referral occurs.  29 C.F.R. § 1601.13(b)(1).  The sole case cited by Defendant to support its position, <u>Jones v. Baskin, Flaherty, Elliot & Mannino, P.C.</u>, 738 F. Supp. 937 (W.D. Pa. 1989), <u>aff'd mem.</u>, 897 F.2d 522 (3d Cir. 1990), involved a plaintiff who explicitly instructed the EEOC **not** to refer a charge to the PHRC.  Either Plaintiff's charge should be deemed filed with the EEOC despite the PHRC's failure to refer it or Plaintiff is entitled to equitable tolling of the statutory filing period.  In either event, Defendant's argument for summary judgment on this ground is rejected.

      Prima Facie Case of Discrimination

      Defendant argues that Plaintiff cannot state a prima facie case of sex or pregnancy discrimination because: 1) she was not in a protected class because she was not pregnant at the time she was terminated and she was not "affected by pregnancy" because she returned to work at GFS within one week of giving birth, 2) she did not suffer an adverse employment action in June 2001 because she had not worked for two Portfolio Companies for months beforehand and she continued to work for GFS until December 2001, and 3) she cannot compare herself to any similarly situated employees.  Plaintiff responds that she meets each of these elements: 1) she was terminated during her maternity leave; 2) a termination (with loss of pension benefits) is the quintessential example of an adverse employment action; and 3) she can compare herself to Frank Corris and Jonathan Bonime.

      Plaintiff was in a protected class, in that she alleges that her pregnancy was the improper factor used by the Defendant to terminate her employment while she was on maternity leave, even if she had already given birth by the time she was discharged.  <u>See</u> <u>In re Carnegie Ctr. Assocs.</u>, 129 F.3d at 293 (woman terminated while on maternity leave could state prima facie case of pregnancy discrimination); <u>Marzano v. Computer Science Corp.</u>, 91 F.3d 497, 501 (3d

Cir. 1996) (same).[32]  Moreover, a discharge from employment is unquestionably an adverse employment action, even if the particular entities for which Plaintiff worked on an occasional basis had not utilized her services for months prior to June 2001.  Defendant cites no authority to support its argument that, merely because an employee works on a part-time, as-needed basis, she cannot be "terminated" by a letter purporting to do just that if the entities for which she worked had not recently called for her services.

Finally, Plaintiff compares herself to male counterparts who were not terminated at the time she was or who received more favorable treatment upon their termination.  Frank Corris was terminated several months after the Plaintiff's termination.  (Zugay Dep. at 54.)[33]  ICMI Vice President of Corporate Legal Affairs Daniel Daugherty states that Corris was involuntarily terminated in April 2002 as part of the RIF.  (Daugherty Dep. at 41.)[34]  Corris was under contract with and was provided severance from the Defendant.  (Sinacole Aff. ¶¶ 4, 10;[35] Wadhwani Dep. at 24.[36])  Jonathan Bonime, head of HR and Defendant's legal department, was terminated "a couple months after Patti."  (Zugay Dep. at 31, 54.)  Daugherty states that Bonime left at the end of August 2001.  (Daugherty Dep. at 39.)[37]  Bonime was under contract with and was provided severance from the Defendant.  (Sinacole Aff. ¶¶ 4, 9, 10.)

Defendant argues that these individuals were not similarly situated because they were full-time employees and she was not.  Michael Zugay states that, other than the Plaintiff, there are and have been no senior level HR employees of any of the Portfolio Companies who were compensated on a W-2 hourly basis, who worked on an as-needed basis, who generally worked

_____

[32]The cases Defendant cites involved women who were terminated after they returned from maternity leave and are inapposite.

[33]Pl.'s App. Ex. B (Docket No. 39).

[34]Docket No. 45 at 351.

[35]Pl.'s App. Ex. E (Docket No. 41).

[36]Pl.'s App. Ex. A (Docket No. 39).

[37]Docket No. 45 at 349.

less than 35 hours a week or who worked from home.  (Zugay Aff. ¶¶ 19-23.)

Some courts have accepted this argument and determined that plaintiffs could not state a prima facie case of discrimination under these circumstances.  See Ilhardt v. Sara Lee Corp., 118 F.3d 1151, 1155 (7th Cir. 1997) (part-time attorney who alleged that she was terminated because of her pregnancy could not compare herself to other members of the law department, who were all full-time).  However, the Court of Appeals for the Third Circuit has rejected this approach to the prima facie case because

> it would seriously undermine legal protections against discrimination.  Under [the employer's proposed] scheme, any employee whose employer can for some reason or other classify him or her as "unique" would no longer be allowed to demonstrate discrimination inferentially, but would be in the oft-impossible situation of having to offer direct proof of discrimination.  We see no value in, and no mandate in our jurisprudence for, such a requirement.
>
> ...
>
> All employees can be characterized as unique in some ways and as sharing common ground with "similarly situated employees" in some other ways, depending on the attributes on which one focusses, and the degree of specificity with which one considers that employee's qualifications, skills, tasks and level of performance.  The relevant issue for our purposes is not whether there is some way in which an employee can be classified as unique but, rather, whether the employee can be classified as unique in some way relevant to his or her layoff.  This question, in turn, cannot be considered independently from the reasons proffered for the employee's termination.  Therefore, arguments as to the employee's uniqueness should be considered in conjunction with, and as part of, the employer's rebuttal–not at the prima facie stage.

Marzano, 91 F.3d at 510-11 (footnote and citation omitted).  See also Rodgers v. U.S. Bank, 417 F.3d 845, 852 (8th Cir. 2005) (concluding that "rigorous" application of whether employees are similarly situated goes to third stage of shifting-burden test).  Therefore, the Court concludes that Plaintiff can state a prima facie case of pregnancy discrimination.

<u>Defendant's Proffered Reason and Plaintiff's Evidence of Pretext</u>

Thus, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for terminating Plaintiff.  Defendant's proffered reason is the RIF and its analysis of Plaintiff's position thereunder.  Michael Zugay states that he participated in the decision to eliminate Plaintiff's position (Zugay Aff. ¶ 3) and that:

> Beginning in late 2000 and continuing through at least December 2002, there were ongoing reductions in force in the workforces of the Portfolio

18

Companies.

> Based upon the Peoplesoft electronic data maintained by ICMI and other Portfolio Companies in the regular course of business regarding employee headcount, the total number of United States employees of the Portfolio Companies combined fell dramatically, approximately as follows:

| | |
|---|---|
| September 1, 2000 | 4000 employees |
| December 1, 2000 | 3000 employees |
| March 1, 2001 | 2800 employees |
| June 1, 2001 | 2400 employees |
| September 1, 2001 | 2200 employees |
| December 1, 2001 | 1900 employees |
| March 1, 2002 | 1600 employees |
| June 1, 2002 | 1500 employees |
| September 1, 2002 | 1500 employees |
| December 1, 2002 | 1400 employees |

(Zugay Aff. ¶¶ 11-12.)  He further states that:

> The June 22, 2001 letter from Frank Corris was sent to Plaintiff as part of [a] reduction in force then taking place in an effort to reduce costs.

> Plaintiff was among those selected for termination because she was a non-full time, as needed, W-2 hourly employee working remotely from home and because her job functions either could be eliminated altogether or could be absorbed by full time salaried employees working from the offices of certain of the Portfolio Companies.

> No individual was hired to replace Plaintiff after MSC, ICMI, Mascot and GFS stopped utilizing her services.

(Zugay Aff. ¶¶ 16-18.)

Plaintiff's only evidence of pretext is to point again to two individuals whom she asserts were treated more favorably.  She states that "Frank Corris and Jonathan Bonime both received severance packages from iGate after their respective terminations."  (Sinacole Aff. ¶ 4.)  She notes that these two men were the only director-level or higher HR employees working for iGate, that both had employment agreements and that Bonime was provided $126,923.00 in severance payments as well as an additional six months of stock options vesting following his termination. (Sinacole Aff. ¶¶ 8-10.)

However, Defendant notes that:

> The majority of individuals whose employment was terminated by the Portfolio Companies during the 2000 – 2002 reduction in force were men or non-pregnant women.

> The majority of people whose employment was terminated by the Portfolio

19

Companies during the 2000 – 2002 reduction in force had not recently taken FMLA leave.

> There were women employed by the Portfolio Companies who were pregnant and took leave during the 2000 – 2002 reduction in force who were not terminated.  For example, Jenny Fair gave birth on February 26, 2001, took a six week leave, and is still employed by one of the Portfolio Companies.

(Zugay Aff. ¶¶ 13-15.)  In addition, Defendant contends that Plaintiff's responsibilities did not generally include day-to-day HR administration; rather her work focused on policy and special issues and as such, she can be compared to Trikendra Pratap Singh Deo, Mark Walztoni and Robert Chandis, two of whom (Waltzoni and Chandis) are both men and had not recently taken FMLA leave in March 2001 when their employment was terminated.  (Shetty Aff. ¶¶ 3-5.)

Plaintiff contends that Defendant cannot refer to individuals working for other Portfolio Companies because, in its first argument, it stressed the independence of those companies.  However, as explained above, the Court has assumed that iGate was Plaintiff's employer.  Moreover, as she herself has emphasized, she was terminated from iGate and all its subsidiaries.  Thus, if other Portfolio Companies terminated men who had not taken leave and kept pregnant women in their employ during the RIF, these facts undermine Plaintiff's attempt to demonstrate that the RIF was a pretext for unlawful pregnancy discrimination.[38]  Moreover, as noted above, even courts that do not require a strict application of the similarly situated employee issue during the prima facie case do apply the standard rigorously during the pretext stage of the analysis.  Marzano, 91 F.3d at 510-11.

Defendant notes that Jonathan Bonime was general counsel for iGate Corp. and ICMI and thus was not in a position comparable to Plaintiff's.  (Daugherty Dep. at 39.)[39]  Similarly, Frank Corris's responsibilities included procurement and both he and Bonime had significant supervisory and day-to-day administrative responsibilities that Plaintiff did not.  (Daugherty Dep.

---

[38]Defendant also argues that its favorable treatment of Plaintiff during her first pregnancy leave in 1999 further undermines her claim that she was treated in a discriminatory fashion two years later.  The Court need not reach this argument.

[39]Def.'s Supp. App. (Docket No. 45-2) at 349.

at 37;[40] Shetty Aff. ¶ 3.)

Plaintiff has not explained how she can compare herself to other employees, who worked full-time in different positions, in demonstrating that her employer's proffered reason for her termination–that the responsibilities of her W-2 hourly, as-needed position could either be eliminated altogether or absorbed by others in the company–is a pretext for unlawful pregnancy discrimination.  See Simpson v. Kay Jewelers, Inc., 142 F.3d 639, 645 (3d Cir. 1998) (a plaintiff "cannot selectively choose her comparator" in order to satisfy her burden of demonstrating that similarly situated persons were treated differently).  Moreover, the Court of Appeals has held that an employer may consider an employee's absence on maternity leave in making an adverse employment decision and an employee may not recover under the PDA unless she demonstrates that the employer treated her differently than it would have treated a non-pregnant employee absent on disability leave.  In re Carnegie Ctr. Assocs., 129 F.3d at 297 (noting that employee failed to meet this burden even when employer had no other employee on disability leave for a protracted period for reasons other than pregnancy to whom she could compare her situation).

Plaintiff contends that it "defies logic to believe that the Defendant saved money by eliminating an hourly employee they had not paid for five months while retaining two male salaried employees who were performing functions the Plaintiff was qualified to perform, and could have performed at a reduced cost."  (Docket No. 49 at 7 n.12.)  However, the Court of Appeals has emphasized that "we do not sit as a super-personnel department that reexamines an entity's business decisions."  Brewer v. Quaker State Oil Ref. Co., 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted).  Or, as stated somewhat differently, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Fuentes, 32 F.3d at 765.

Plaintiff has failed to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

[40]Docket No. 45 at 348.

21

a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons." Id.  Therefore, with respect to Counts II and III of the complaint, the motion for summary judgment will be granted.

Counts IV-V: Breach of Contract/WPCL Claims

Defendant argues that it was not a party to Plaintiff's employment contract and that it therefore cannot be held liable for any alleged breach thereof.  As explained above, however, the contract itself states that it applies to parents, subsidiaries, successors and transferees.  Defendant contends that the word "company" has an expansive meaning only with respect to the scope of the confidentiality and non-compete provisions therein.  However, as Plaintiff notes, this construction of the contract would require drawing inferences in favor of the Defendant, the moving party, which is inappropriate when considering a motion for summary judgment.  Doe v. County of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001).  This argument is unavailing.

Defendant also argues that the subsequent agreement and conduct of the parties precludes Plaintiff's contract-based claims for notice, severance or other benefits.  Specifically, it states that, under the 1998 contract with MSC, Plaintiff was compensated on the basis of an "annual base salary" of $80,000 and received "standard Company benefits," bonuses and stock options (Sinacole Dep. at 21, 27-28)[41] and was required to "devote all of ... her business time" to the business of the Company and thus she worked, from May 1998 through July 1999, full-time at MSC's offices in Oakdale, Pennsylvania as Corporate Human Resources Director, a position which required her to supervise other employees (Daugherty Aff. ¶ 11).  By contrast, in 1999, Plaintiff and MSC agreed that she would continue to be employed, but as a W-2 hourly employee, compensated at the rate of $75 per hour for such work as her employer determined to assign to her (Sinacole Dep. at 29-30, 36-37, 55-56, 131-32, 134-35, 149-52, 172;[42] Docket No. 29 at 53-54), she would no longer entitled to the full range of "standard Company benefits," she could not have participated in the 401(k) plan of either MSC or ICMI and could not have

---

[41]Docket No. 29 at 172, 175-76.

[42]Docket No. 29 at 177-78, 180-81, 197-98, 239-40, 242-43, 251-54, 259.

received cash bonuses (Sinacole Dep. at 37-40, 135-36;[43] Daugherty Aff. ¶ 13), she was not eligible for either short-term or long-term disability (Sinacole Dep. at 248-49),[44] she was no longer Corporate Human Resources Director, but was Director of Human Resources Consulting Services, and she worked remotely from her home in Philadelphia and had no supervisory responsibilities (Sinacole Dep. at 149-50, 247;[45] Daugherty Aff. ¶¶ 12, 14).

Plaintiff argues that, although changes were made to some provisions of her contract, the contract itself remained in place.  However, the issue is not whether the contract existed at all, but whether the particular provisions she seeks to enforce were still in effect.

Defendant notes that the written agreement provided for severance "equal to three (3) times the monthly base salary of the Employee then in effect, payable in the form of salary continuation in accordance with the Company's then existing payroll practices."  (Agmt. ¶ 11.)[46] But as an hourly employee, Plaintiff had no monthly base salary that could be continued or could provide a basis for calculating any severance payment.  Moreover, as of June 30, 2001, she had earned nothing from Mascot for four months, nothing from ICMI for five months and nothing from MSC for a year.  (Docket No. 29 at 94-117, 125-35; Sinacole Dep. at 57, 68, 70-71, 75, 85-86.[47])  Nor could she seek severance based on her earnings from GFS, since she continued to work for GFS, earning more than $40,762.50 in gross wages after June 30, 2001.  (Walsh Decl. ¶ 17 & Ex. M.)

Similarly, given the as-needed nature of her work and the fact that, in June 2001, she had not worked for MSC, ICMI or Mascot for months, she cannot claim that she was still entitled to the 15-day notice of termination provision in the original contract.  (Agmt. ¶ 10.)  Moreover,

---

[43]Docket No. 29 at 181-84, 243-44.

[44]Docket No. 29 at 269-70.

[45]Docket No. 29 at 251-52, 268.

[46]Docket No. 29 at 6.

[47]Docket No. 29 at 199, 203-05, 209, 218-19.

Defendant contends that, even if a notice provision applied, she suffered no damages from any lack of notice. Plaintiff has not explained how the notice provision applied to her under the circumstances of her as-needed employment status in June 2001.

Therefore, with respect to Counts IV and V of the complaint, the motion for summary judgment will be granted.

## V.       CONCLUSION

Based on the foregoing, the motion for summary judgment filed by Defendant shall be granted. An appropriate order follows.

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:      Joel S. Sansone
         Scanlon & Sansone
         428 Forbes Avenue
         2300 Lawyers Building
         Pittsburgh, PA 15219

         John W. Murtagh
         Murtagh & Cahill
         110 Swinderman Road
         Wexford, PA 15090

         Alexandra P. West
         Kevin P. Lucas
         Manion, McDonough & Lucas
         600 Grant Street
         Suite 1414
         Pittsburgh, PA 15219